Cynthia MORGAN, Plaintiff-Appellee,

v.

Charles CASHION and Ernest Cashion and Carlton B. Wakefield, Defendants-Appellants.

Court of Appeals of Tennessee, Western Section, at Jackson.

Feb. 8, 1982.

Application for Permission to Appeal Denied by Supreme Court Aug. 30, 1982.

Robert M. Johnson, Thomas J. Walsh, Jr., Memphis, for defendants-appellants.

Don L. Dowden, Charles M. Holt, William M. Monroe, Memphis, for plaintiff-appellee.

NEARN, Judge.

This litigation arose out of an automobile collision involving a vehicle owned by Ernest Cashion, operated by his son, Charles, and a vehicle owned and operated by Carlton B. Wakefield. Plaintiff, Cynthia Morgan, was a passenger in the Cashion vehicle when it collided with the Wakefield vehicle. Morgan brought suit against the Cashions and against Wakefield for injuries suffered in the collision. A jury returned a verdict for the defendant Wakefield but against the defendants Cashion for $450,000.00. Only the Cashions have appealed to this Court.

All issues raised on appeal are directed to evidentiary matters, the charge of the Court to the jury, and the size of the verdict. The determinative issue is in regard to the admission of certain expert testimony. We hold that the admission of the testimony of Dr. Thomas O. Depperschmidt was error. Further, we cannot say that the admission of such evidence was harmless. Therefore, the judgment must be reversed and the cause remanded for a new trial. Other issues raised on appeal are rendered moot.

Cynthia Morgan suffered serious injury in the collision. She was taken from the scene of the accident to the hospital where she remained in the intensive care unit for twenty-seven days and thereafter in the regular unit of the hospital for approximately one month. There is no need to here set forth in detail the full extent of her injuries and her fight for life. For present purposes suffice it to say that she suffered lung injuries and a broken pelvic bone. Medical expenses incurred at the time of trial were approximately $30,000.00. However, due to modern medical techniques and treatment by skilled physicians, a marked recovery was made. One physician testified that she had a 20% permanent pulminary disability as a result of the lung damage. The orthopedic physician testified that she would have a 20% permanent orthopedic disability as a result of the bone injuries.

Testimony was also introduced in order to prove loss of future earnings. Cynthia Morgan was twenty-two years of age at the time of trial and was attending college in order to prepare herself for her chosen career in neuropsychology. Dr. Depperschmidt was called as an expert economist to give his expert opinion as to the amount of future earnings that will be lost as a result of plaintiff's injuries. Counsel for the defendants objected to his testimony and, outside the presence of the jury, Dr. Depperschmidt testified as to what he proposed to testify to in the presence of the jury. The objection was not that Dr. Depperschmidt was not an expert economist. The nature of the objection was that his testimony was simply inadmissible. In order to better understand our holding on this issue, we deem it proper to here quote directly from the record the pertinent portions of the *voir dire* examination of the witness:

Q. Are you competent to make a relationship or draw a distinction—to make a connection between medical disability and lost earning capacity?

A. Yes, sir, I am.

Q. You are competent to do that?

A. Yes, sir, if someone tells me what percentage of disability a person has, I can make some judgment as to the loss of earning capacity from that.

Q. Well, I say disability. Are you qualified to say that a medical disability of twenty percent to the lung will cause twenty percent loss to someone who is in a given profession?

A. Yes, sir, I'm qualified to say that.

Q. What is the basis for your qualification to say that?

A. My experience in labor economics and labor market analysis, knowledge of people who have disabilities of one type or another who have experienced some loss of earning capacity as a result. I have in mind, for example, knowledge, reading knowledge of coal miners who have had pulmonary disorders, black lung disease as a result of their working in the mines. There is some disability there and that translates into lost earning capacity.

Q. Dr. Depperschmidt, do you know—in this case we have a twenty percent pulmonary disability and twenty percent orthopedic disability, and you are qualified to add those together and give us 40 percent earning capacity in a professional category? You're qualified to make that connection?

A. If I may answer the question in this way, since the report was prepared, there has been additional evidence as I understand developed in this case, and Mr. Dowden has conveyed that information to me, and I have made an adjustment in the disability as a result.

Q. Your report is not then the basis for your testimony today?

A. Yes, sir, it is. It is the basis, but there is an addition to it.

Q. What is that addition?

A. Well, the testimony as I understand it has been developed that the disability is from twenty to forty percent.

Q. Well, have you seen that testimony?

A. No, sir, I have not.

Q. Do you know whether that is in terms of earning capacity or medical impairment?

A. That is medical impairment as I understand it.

Q. And you feel comfortable in translating yourself, your own qualifications and experience into earning capacity for this particular plaintiff?

A. The loss or impairment of earning capacity, yes, sir.

Q. Dr. Depperschmidt, are you familiar with the expertise known as rehabilitation and work impairment and that area of knowledge?

A. No, sir, in the area of handicap disability, I have no technical expertise in that area at all.

Q. Isn't that what we're talking about here, a person who has a handicap?

A. As I understood your question, you were asking for the translation of medical impairment into economic loss of earning capacity, and I stated I was qualified to do that without stating in any way my ability to judge the disability or impairment on the first part.

Q. That is what I am getting at, in terms of work function, you say you are qualified to translate medical disability into work function?

A. Into loss of earning capacity, yes, sir.

Q. And are you going to testify that she's going to lose twenty to forty percent of her time and wage earning power at work because of what you know to be her disability?

A. Yes, sir, based on the medical testimony that has been provided, yes, sir.

Q. And this is more than just a mathematical computation on your part, this is—or not—

A. No, sir, I want to be entirely clear on this. I was provided with some data, some data from the family, some data from Mr. Dowden and some other data that I routinely use in such matters. And all I'm saying is that once I have a medical disability percentage that that can be translated into loss of earning capacity.

Q. One more clarification. Are you equating, then, the medical impairment with the impairment of earning capacity? You're saying the figures, they're 20 percent on one and 20 percent on the other?

A. Yes, that is essentially correct.

MR. WALSH: All right. I don't think that is legally correct and I would like to argue that to the Court. I'm through with this witness. I would like to present some legal argument on it.

THE COURT: I think what Mr. Walsh is asking and I might ask a little more just for clarification of the point is this: If you assume in your hypothetical that a person is twenty percent disabled from an anatomical point of view, do you begin with twenty percent as the figure against earning capacity?

THE WITNESS: Yes, sir.

THE COURT: In other words, do you say that a person who is—who has twenty percent anatomical or bodily disability is twenty percent less able to earn?

THE WITNESS: Yes, your Honor, that is what I am saying. By that, if you mean twenty percent of total ability, that twenty percent is reduced by the medical impairment, yes, that is what I would say.

THE COURT: I think what he's going to ask you or maybe what he plans to argue is this: that is it not conceivable depending upon different work activities that a person with, say, a twenty percent physical disability might be ninety percent disabled. The violinest loses his little finger for example, is the old illustration on his left-hand. He might be a hundred percent disabled from his field.

Or on the other hand, a person with a twenty percent disability physically due to some other type of work, it may be of a sedentary nature, might be five percent disabled.

Now, I think it is that sort of differentiation that he's concerned about. Is there anything in your calculations that takes this into account?

THE WITNESS: No, your Honor, except for this: The fact—the very instance that you were talking about from the standpoint of perhaps that 95 percent disability or zero disability even though a medical expert testifies twenty percent disability, because of that very variance, the variance itself, I think it is appropriate to use a twenty percent figure and translate it into a twenty percent lost earning capacity as an average figure.

So what I'm saying is to be sure there might be some variance from the standpoint of lost earning capacity might not be exactly twenty percent in any particular case. Simply because the medical testimony is twenty percent, but that nonetheless is the best approximation of that disability from the standpoint of lost earning capacity.

THE COURT: All right.

The Trial Judge then permitted Dr. Depperschmidt to testify to the jury in the manner indicated. The witness testified that the value of plaintiffs' loss of future earnings would be somewhere between $112,000.00 and $226,000.00 depending upon her percent of anatomical disability.

The colloquy quoted above convinces us that Dr. Depperschmidt was not qualified to testify as to the relationship between the anatomical disabilities of Ms. Morgan and the impairment of her future earning capacity. He was only qualified to testify as to the loss of earnings a person her age, in her chosen profession, would suffer if that person had a specified earning disability—not anatomical disability. However, Dr. Depperschmidt was allowed to testify as an expert to the effect that Ms. Morgan's earning capacity was impaired in direct proportion to her anatomical disabilities. Such an assumption does not exist in the law; Dr. Depperschmidt was not qualified to make such an assumption; and the record contains no foundation for such an assumption.

The distinctions between anatomical disability, impaired earning capacity, and economic loss were recognized by this Court in *Acuff v. Vinsant,* (1969) 59 Tenn.App. (W.S.) 727, 443 S.W.2d 669, in which an accountant sought to testify as to the difference in the profits in plaintiff's business after she had suffered an injury. The Court held that the testimony was admissible and relevant to the issue of plaintiff's loss of earning capacity but in doing so, the Court pointed out:

It is to be clearly noted that the testimony of the accountant and his expert opinion that the absence of plaintiff from the business was the cause of the drop in revenue, and its resulting loss of profits, is not admissible as proof that the plaintiff suffered a loss of earning capacity. This evidence is admissible as some proof of the value of plaintiff's earning capacity. The fact of whether or not plaintiff actually suffered a loss of earning capacity must be, and in this case is, established by other competent evidence.

In other words, the error committed in the present case was that Dr. Depperschmidt was found qualified as an expert to testify as to plaintiff's reduced ability to earn an income when he was not properly qualified. Dr. Depperschmidt could qualify as an expert to the extent that he could offer opinion evidence as to the value of the loss of future earning capacity if given the percentage of work disability or lost earning capacity of plaintiff. However, he admittedly was not an expert in translating anatomical disability into work disability, but simply assumed they were one and the same, which they are not. Therefore, he was not an expert in that field of information upon which he was ultimately allowed to testify.

On appeal, the appellants Cashion have made no complaint regarding the jury's finding of their liability. All issues raised ultimately are complaints regarding the amount of the verdict. Also, at the trial level no cross issues were raised between the defendants. Plaintiff-appellee is evidently satisfied with the judgment in favor of Wakefield as she did not appeal that judgment. Wakefield is perfectly content with the Trial Court's action and had absolutely nothing to complain about and accordingly did not appeal. Therefore, the judgment in favor of Wakefield is final to all.

Accordingly, this case is remanded for a new trial only as to the defendants Cashion and only on the issue of damages.

Costs of appeal are adjudged against appellee and Trial Court costs will await the outcome of the new trial.

Done at Jackson in the two hundred and sixth year of our Independence and in the one hundred and eighty-sixth year of our Statehood.

TOMLIN, J., and WHITENTON, Special Judge, concur.